Wright, J.,
dissenting. Being unable to agree with the majority of the court in the conclusions announced, it is proper to state the reasons for dissent. There does not appear to be any difference with regard to the. principles *202 of law involved; it is as to a question of fact simply that we arrive at contrary results. No doubt is entertained as to the soundness of-those wise legal maxims which declare that the trustee can not manage his trust tor his own benefit; that an administrator can not purchase at ,his own sale; that no man can serve two masters. But while it is altogether proper to hold these j ust principles in profound reverence, our great regard for them should not be permitted to hurry us into unwarranted belief that every trustee leans toward defrauding his beneficiaries, and that there is a predisposition in all administrators to swindle.
The main question of fact about which we disagree in this ease isDid Nicholas Longworth purchase at his own sale, so as to be now held as a trustee for the heirs? The testimony is voluminous, and to satisfy himself, each one must examine the whole of it with care.
Longworth and Benj. M. Piatt, as administrators of John H. Piatt, sold considerable quantities of property, in Cincinnati, in 1825, 1827, and 1829. Before the first of these sales, Longworth had written to his sister Catharine; and as this letter is the corner-stone upon which a large structure of fraud, actual and constructive, is erected, it is here given in full, so far as relates to this question:
“ Cincinnati, May 15,1825.
“ Dear Catharine : The sale of the real estate of the late John H. Piatt takes place in six or seven weeks. Most of -the property is valued low, and will be sold — should no person bid more — from one-half to two-thirds the amount of valuation. As administrator, I am proscribed from purchasing, but shall have considerable fees, as administrator, that I could apply in any purchase you might make, and the purchase-money could be repaid me from the sales. I have no doubt a considerable profit could be made. I therefore wish you to write Jones, and direct him to attend at the sales and purchase such as may be deemed advisable. I will, with him, particularly examine the several pieces and *203 decide which will be the most advantageous purchases. Do not omit writing soon.” . . .
It certainly can not be claimed that an administrator is forever, and at all times, precluded from buying any property which may at any time have passed through his hands as such administrator. There must, at some time, arrive a period when his duties and responsibilities cease. If an administrator sells property — the fairness, justness, and correctness of that sale not disputed — can it be said that a series of years thereafter he may not buy the identical property, either from the original purchaser or those to to whom he may have conveyed? Certainly it must be that he would have the right .so to do. The rule of law states it, that the administrator can not purchase at his own sale; and the reason of the rule — that he can not at once be buyer and seller — shows that the interest of the administrator in the purchase must have existed at the time of the sale.
Let us consider, first, the sales to the sister of Mr. Long-worth.
His answer, as to all these sales, avers that “ at the time ” they were made he had no interest in them whatever. The allegation being thus denied, complainants were fairly warned that they must prove it. The answer beiug under oath, under the practice in chancery, is supposed to have some weight as evidence. The various depositions of the sisters to whom the property was sold, state that it was bought for them; so that if the theory of complainants be true, we must disbelieve the sworn statements of both buyer and seller. It is conceded that it is the interest of both to swear as they do — Longworth to save his property and his reputation for integrity; the sisters to shield from the charge of hypocrisy and treachery the good name of a brother to whom they seem to have been tenderly attached. But for all this the statements may be true. The secret was known only to themselves. At different times and in distant states, without communication with *204 one another, each tells his and her story. These stories agree. This of itself is not evidence to me that both lie.
In order that this secret trust should be established, and that the purchase at the sale should have been for Long-worth’s own benefit, it is to be remembered that both sides must have conspired to that end. It is not sufficient that Longworth himself should have had that intent and purpose ; but unless Catharine Longworth, the purchaser, was of the same mind at the same time, certainly the result does not follow. It could not have been a purchase for Longworth’s benefit, unless both he and his sister so understood it. As in any other contract, the minds must have met on the same point. Parties could not very well agree to anything unless they knew what it was.
It should be borne in mind that all the sales in which Catharine Longworth was interested were in July, 1825. It is so stated in the order of sale; it is so stated in the administrator’s deed to her, and in the deed to her and Howell; it is so stated in defendant’s brief; it is so stated in complainant’s brief, and therefore must be true.
I consider this date important. To prove the fraud alleged in this, case, which is a sale by the administrator virtually to himself, we must fasten knowledge and intent not only upon Nicholas, but upon Catharine, prior to the transaction itself. The bulk of the letters and documents which are thought to establish the fraud so clearly, are all subsequent to the sales of July 25, in which alone Catharine was interested. There is but one paper prior to that date ; it is the letter of May 15, already given. "Whatever else there may be to prove that Nicholas had corrupt designs, this letter is all the evidence there is to show that prior to the sales of July 25, Catharine Longworth confederated with her brother to buy the property, nominally for herself, really for him. ■ It matters not what they or either of them may have done, thought, or intended after that date. If the sale was bona fide to Catharine on July 25, no subsequent events can make it fraudulent. The im *205 peachment of that good faith must be determined by the deed, thought, and intent, as it was before and at the time of these sales.
We must not here be confounded with the idea that intent alone does not determine the question of fraud. There is no doubt whatever that a man may be guilty of fraud, although he may have been entirely innocent and honest in his own heart, and quite free from moral blame. A trustee may not know that in law he is precluded from buying at his own sale. He may see the property of his ward, at a forced sale, going at ruinously low rates, and, out of the purest and best motives, may offer largely more than any one else will give; not because he wants the property, but for- the reason that he honestly thinks the estate is being ruinously sacrificed. Yet that sale can not stand if complained against; and integrity of purpose does not shield the trustee from the charge of improper action.
But in this case it is the intent and the intent alone that settles the nature of this transaction. If the only party to it were Nicholas Longworth himself, it would be to no purpose that we sought his motive. But there are two parties — Nicholas Longworth and his sister Catharine. It is alleged in the bill, and to sustain the case it must be proved, that these two agreed that at the sale Catharine should buy for her brother. This is claiming a corrupt contract between these two parties. No contract, corrupt or otherwise, can be established, unless the minds met and agreed upon the same proposition. If Nicholas Long-worth did intend what is claimed, unless Catharine was of the same intent, the contract or agreement, which is the sole foundation for this action, did not exist, and could not have existed.
Consider, then, this letter, solely to determine whether from it alone it can be inferred that Catharine agreed or understood that she was becoming a party to this corrupt transaction. Her brother informs her that the sale is about to take place ; that he, as administrator, can not purchase; that out of his fees he could lend her the money to buy, and *206 she could repay him out of her sales ; that she can make a profit; that if she will write to an agent, her brother will advise him as to which lots she should purchase. Can it be inferred from this evidence that Catharine Longworth, at that date, agreed to become party to such a design as is now imputed, or the tool to accomplish its execution ? No answer of hers to this communication anywhere appears, and from her silence assent is inferred, not to what it contains, but to exactly what it does not contain.
Suppose such a letter had been written by an adminis-trator to any one else than his sister. It has never been claimed as a default in such an officer, that he advertised his sales as widely as possible; that he urged upon persons to become buyers. Indeed, the advising with them what lots to buy, is only affording them that infox-mation for which they would naturally inquire of an administrator. Evexi an offer to advance the money to make the necessary payments may be construed as evidence of a desix-e to facilitate sales. ■ I can therefore see xxothing in this letter alone which is not just as consistent with a desire to discharge his duty and forward the business in his charge, as with a pre-determined purpose to commit a fraud. If the letter had been all fair and propei-, written to a stranger, does the fact that it is written to a near relative convert it from truth into falsehood ? Upon the theory of plaintiffs, to make Miss Longworth ¶articeps criminis, she must have understood it in exactly an opposite sense from what the words import. She xnust have deliberately lent herself to a scheme of deception. She must have recognized the hypocrisy of her brother, and have been satisfied to profit by his infamy, which was the more mean, because practiced toward those who were compelled to rely upon his honor. All the severe things, therefore, which are said in profusion of Nicholas Longworth, would apply to this lady of whom the counsel say : “ She appears to have been a pious, excellent lady . . . undisturbed by any scheme of avarice or human ambition . . . with no desire but to live a quiet, retired life.” The evidence fully sustains *207 this charge made against her by the learned counsel for the plaintiff.
I can not but believe that whatever may have been the furtive design of the writer, Miss Longworth thought, and was justified in thinking, that this letter meant precisely ■what it said, instead of precisely the contrary. If this be true, she could not have been a party to the scheme alleged. Unless she did understand and agree to the scheme at the time, the sale could not have been nominally to her, really to her brother, for her assent was wanting to any such arrangement.
At the sale in 1827, certain property was bid in by Samuel Lewis for John Longworth and Mrs. Morris, brother and sister of Nicholas Longworth. There is no evidence in the shape of letters to or from John or Mrs. Morris, of date prior to this sale; none whatever. Indeed, there are none at all. As in the case of Miss Catharine, to fasten upon them this fraud, it should be shown that at or prior, to the sale, they were informed of, and entered into this corrupt bargaining. The only evidence of the kind is in a letter from Nicholas to Catharine Longworth, of date January 22, 1827, in which this sentence occurs : “ There will be a second sale of the real estate of John H. Piatt, deceased, in a few days, when I intend, should the property go low, to have some bid in for John’s use. I have no doubt $2,000 or $3,000 may be made by it.” If it be conceded that an administrator may urge others to buy, even by telling them that a profit can be made, the fact that the same course is pursued toward a relative does not of itself render the transaction vicious. The same considerations which lead to the conclusion that at or before the date of her purchase, Catharine Longworth was not aware of, and was not a party to any contract, that she should bid in for her brother’s benefit, apply with equal force to the purchases made for the benefit of John Longworth and Mrs. Morris.
Samuel Lewis is the man through whom John Long-worth, his sister, and Mrs. Morris perpetrated this great fraud. His deposition is taken. He is asked whether he *208 was an actual or nominal purchaser. He gives the not unreasonable answer that, after the lapse of a quarter of a century, he can not remember one-half the purchases he made at that time. "When pressed more particularly to relate what the circumstances were, he still says he can not recall them, unless some very special circumstances fixed them in his mind. It does not seem sufficient proof of a fact, that the witness should say he knows nothing whatever about it.
The bill charges that Samuel Lewis conspired with Longwoi’th to defraud the heirs. As a circumstance it is said they were law partners at the time. If they were partners; if he did conspire Samuel Lewis must have known it. He is examined to prove it. If a conspiracy is charged, and one of the conspirators is put under fire of legal examination, the chances are that the truth will come out. "When his deposition was taken, Mr. Lewis appears to have had ixo possible interest which should induce him to prevaricate. So far from establishing any of the charges made, he does not make the slightest approximation to it.
It does appear to me that we should be more than cautious in impeaching the good faith of transactions which occurred more than fifty years ago; transactions that were not impeached at the time by those most interested in them, nor until long afterward. One of the plaintiffs, A. S. Piatt, and Isaac Dunn, father of the others, were present at the sale. Piatt bought a few pieces of property. Dunn bought some twenty; but for what purpose or for whom, he never seems to have known — at least he is unable, in his deposition, to tell. Their relative, Benj. M. Piatt, ux’ged them to buy, offering them the benefit of his administrator’s fees. The plaintiffs then, or those who then represented them, were familiar with all that occurred at the sales, and made objection to nothing.
The administrator’s appear to have been zealous in the discharge of their duties. They rescued the estate from a claim of the Bank of the United States, which amounted to over $300,000. The court allowed them, for this ser *209 vice, the sum of $18,000. These heiis did not object then, though creditors did. The heirs in 1846 assented to it, with a full knowledge of what they were doing; but, with confused notions of right and wrong, they for the first time attack it in 1859. The administrators seem to have made efforts to make the property sell well when it did sell. The witnesses who testify, say that the sale was open, public, and fair; that the property brought high prices. One defendant, who is charged with complicity in the general scheme of peculation, avers that he attended the sales and bid, and the lots went to such figures that he thought the administrators had employed by-bidders and puffers, whereupon he quit bidding. He is dropped out of the case. According to the best figures I am able to make, the property sold bought more than the entire appraised value, though the law provided that unimproved, it might be sold for one-half; improved, for two-thirds of its appraised value. The result was, that out of an insolvent estate these heirs have realized values said in argument, though not in the Record, to be of large amount. This general beneficial result does not justify the administrator in any side swindle, if such there were; but it does serve to show, upon an extended view of the whole field of operations, that they acted for the benefit of the heirs. It further shows, to my mind, that if Nicholas Longworth were the dishonest, unscrupulous person we must believe him to have been, in order to sustain the plaintiffs’ claim, he would not have contented himself with any small, fragmentary portion of the estate, but would have taken the whole.
Comment has been made upon the letter to Catharine Longworth, before the sales to her, as being the only legitimate evidence to show what the nature of those sales really was at the time they took place. There are many subsequent letters and documents from Nicholas Long-worth. Erom these it appears that he did urge them to buy; that he offered to lend them the money; and that *210 they could repay him out of the profits they might make when they resold. In this correspondence he states and reiterates that he can not buy for himself, because he is an administrator, either directly or indirectly. These statements are harped upon and tortured to mean, that because he is precluded from buying she is to buy for him. Had Longworth not thus defined his position, how natural for them to say : “If this is so good a purchase, and you have the money at hand, being upon the ground, why do you not buy yourself?” In a correspondence like this, a correspondence between brother and sister,'where, if ever, the truth is told and the inmost thoughts spoken, to pervert the meaning of language in order to twist it into falsehood, where a perfectly natural and true explanation lies directly in our path, as it appears to me, can only lead us away from just conclusions.
In various places throughout these papers appears the expression that the “ profits ” are to be for the purchasers, and the inference is thence drawn that Longworth was the buyer, and the others were to have only what the speculation realized. It seems to me that this is hut a play upon words. Take the sentence in the letter of July, 1825, “ the property bid in at the sale, as far as any profit is made, is intended for your benefit.” That states the case exactly as it was. Longworth had advanced the money. The “ profit ” was what remained of the property after he was repaid. But if he was the real buyer, so that it was all his, what “ profit ” could there be to any one else ?
So in another place he speaks of “ certain real estate in this city, bought for her benefit, that is, any profit thereon after deducting the purchase-money which was advanced by me.” If the real estate was not hers after the repayment of the purchase-money advanced, what “ profit ” could there be to her ?
Not to be wearisome with further comment on these papers, the purport of them all is epitomized in a deed from Mrs. Morris, John and Catharine Longworth to their brother Nicholas, of the property they had bought. This. *211 deed is presumed to have been drawn by Mr. Longworth. It is dated December 17, 1834, and contains the following: “ The facts are these: N. Longworth, our brother, purchased real estate in our names, and advanced the purchase-money, any profit the property might bring after repaying him being intended for our use. Some parts have been sold, and the object now is to vest all such purchases in him and his heirs, he having secured to us a certain sum agreed to be given for the profits.”
This word “ profits ” here means simply what 'remained of the property after the purchase-money was repaid, and those to whom such “ profits ” went certainly must have been those who had bought and owned that property.
The extract above given from the deed of 1834, states the facts correctly. The extract is quite true, and sets forth, in a few words, the whole case against Mr. Long-worth. Soon after its date, this is put on the public records of Hamilton county. A strange place to put a statement, which is supposed to convict a party to it of fraud and secret trust. My belief, therefore, is that at these sales this property was really bought for the benefit of Longworth’s brothers and sisters, just as they all aver the fact to be ; that not till after the sales, perhaps several years, did Mr. Longworth first conceive the idea of buying the property himself. This, at that time, he had a perfect right to do.
' There is nothing in this whole mass of evidence which is not just as consistent with the idea that Longworth first thought of buying several years after the sales, as that such purpose existed at the time of the sales.
He suggested to his brothers and sisters to buy, and, though he did not exactly furnish the money, yet, which is the same thing, as an inducement to them, he allowed the amount of their purchases to stand off against his administrator’s fees, so that they need pay no cash. All this he had a perfect right to do, provided he had no secret interest. Some years after he buys the property himself of his brothers and sisters. It will bear repetition to say that *212 from this entire record, it is just as fair to infer that his idea of purchase did not exist until the subsequent period.
Now, when the facts consist with a theory that makes transactions legal and honest, equally well with one which is fraudulent and full of all uncleanness and hypocrisy, which will the law prefer ?
It has been said that the facts were equally in favor of the innocence of these parties and their acts. This is .so, leaving out altogether the statements of the parties themselves who are implicated. Erom these statements we find that Mr. Longworth denies .under oath that he had any interest at the time of the administrator’s sales. The sisters who have testified' make a similar denial; and yet to maintain this charge of trusteeship, upon a set of facts perfectly consistent with innocence, these parties must first be convicted of perjury. I can see no ground for such conviction, except that bi'oad, general principle which holds that “ all men are liars,” and most women too'.
Nothing was more natural than that these administrators should urge people to buy just as they dic^. They knew that the property must be sold. They had no discretion as to the time of sale. The law fixed that. It was a period -of depression in commercial and financial affairs, when the Bank of the United States had its grip upon the vitals of the community. The sales were to be large, and it was perfectly right for the administrators to urge people to buy. They further had the right to advise people to buy in hope and prospect of profit. Certainly they should not have advised them to buy in prospect of loss.
Mr. Ben. M. Piatt did just this thing, and is attacked precisely as Longworth is. Mr. Isaac Dunn, progenitor of most of the complainants, artfully endeavors to convey the impression that Ben. M. Piatt proposed that Dunn should bid in the property, and they should divide the profits. There is no foundation whatever for such an idea, and Dunn’s testimony shows there was none except in his own unpleasant fancy.
In his first deposition, he says the arrangement was *213 that he was to bid off the property, and Piatt was to make the payments, and after a resale the profits were to be - divided.- Then he says that he knew no one but Piatt in the matter, “ and, consequently, understood that he was to sell the property, and divide the profit with me.”
In his first deposition he says : “ The property was bid off by me with an understanding between B. M. Piatt and myself, that when the property was sold I was to have one-half the profit.”
Then being asked “ Who was to have the other half of the profits,” he says : “ Benj. M. Piatt; I know of no other person.” The last clause of this sentence gives the lie to the first. The last shows to be an inference of his own, what the first had stated tó be a fact. '
Thirteen days after Dunn’s first deposition was taken, Ben. M. Piatt testifies. He denies entirely that there was any such arrangement as Dunn suggests, and declares that the idea of dividing profits is entirely without foundation ; that the -whole thing is new to him, and that he did not and could not have entered into any such arrangement, as it would have been obnoxious to his office and duty as administrator. But as Piatt only counterbalances, Philip Grandin overthrows Mr. Dunn. Dunn says Grandin was present when the arrangement was made about bidding off the property. This is what’ Grandin says : “ Prior to the sale, B. M. Piatt proposed to me and the other heirs, as I understood, that inasmuch as the estate of John H. Piatt was insolvent, the heirs could derive nothing from'that source, but that they might purchase the amount of his fees, on a credit at six per cent, interest, as he could not buy himselfj being administrator. I considered it a very liberal proposition, and so said to Isaac Dunn, who declined accepting it,” etc. Grandin scouts -the idea that the arrangement proposed' embraced a division of profits with Ben. M. Piatt.
It thus appears, that both Piatt and Longworth urged their brothers and sisters to buy. Both offered to -lend their fees for that purpose. The facts as against both seem *214 to be similar. Ben. M. Piatt is dropped out of the case, and if all the evidence which is pertinent to him alone, but incompetent as against Longworth, had been likewise dropped, it might materially vary the case.
If, however, the conclusion that these purchases were really for the benefit of Nicholas Longworth is the true one, and the transaction, therefore, illegal, still the cestui que trust may assent to it. The transaction, though voidable, may be ratified by acquiescence or assent. If the cestui que trust, being competent to act, knows or learns all the facts, and does not make complaint within a reasonable time, he is certainly bound by such a silence.
When the sales were made, all the Piatt heirs knew exactly what was done. They were then indifferent. The estate was known to be largely insolvent, and in no event could they ever get anything, and the creditors even but a small percentage. This was the clear outlook in 1825. Had Mr. Longworth bought directly for himself, the heirs would have made no complaint, for they had no interest which could, by any possibility, be-injured. But had they then made any objection; had they then charged that Mr. Longworth was being unfaithful to his trust, the way to end all such difficulties was plain. The property would have been resold. The administrators would at once have proceeded to wind up their office and rid themselves of duties in the discharge of which they only incurred obloquy. The end being, that creditors would have received nothing, and the heirs would have been as fortunate as the creditors. A settlement of the estate, under strict forms of law, would have sacrificed everything and everybody, the largest beneficiaries being the administrators in the fees they wopld have received.
But this was not done. By a system of negotiating; of nursing the assets of the estate; by settling with creditors, when this could be done, some debts being finally barred, a large surplus eventually remained. The administrators gave the heirs all the benefit of these many years of service. Although debts were bought up at discount, in no instance *215 did the administrators charge more than they had actually paid. Of course there was no merit in this, except that of honesty.
But after all this has been done — after the heirs have been lying by twenty-five years seeing it done — it seems to me that fairness and justice should seal their mouths now. They have adopted and ratified Mr. Longworth’s acts by accepting the benefit of them — a benefit which would not have resulted had they otherwise than apparently acquiesced while the acts were being done.
The deed containing the evidence of the transaction as it really was, was recorded, as has been said, in 1834. It is not claimed that, as it there stood, it was notice to these heirs of what it contained, in the sense that public records are constructive notice. But if the evidence in the case is such as to show that they had actual notice, or if they were, fairly put upon inquiry, that would seem to be sufficient. In 1846 these heirs sought a settlement with the administrators. Leaving out of view the testimony of Judge Piatt, the co-administrator, who vindicates the fairness of that settlement in every particular, and who says he imparted, without reserve, all he knew about the estate, there is other evidence quite as important. The heirs did not come prepared to rely upon what the administrators might say. So far from coming as wards to a trustee, they assumed a hostile attitude. They employed able counsel to represent' them. It must be apparent from Mr. Anderson’s testimony that they had been to the office of the Probate Court, then the Court of Common Pleas ; that they had examined the accounts of the administrator and the returns of sales, for Mr. Anderson says they appeared to be as familiar with the business as he was, and they came with the papers, copies, or abstracts in their hands. If the heirs were suspicious enough to employ counsel to search the records of the Common Pleas for the purpose of information, it is not violent to suppose that they went into the recorder’s office to ascertain what had become of the real estate sold to Catharine Longworth and others, .whom *216 the returns showed to h^ve been purchasers. Once there, they would have found the deed of 1834, which would have informed them of every fact they now know. That it was natural for them to make the inquiry whither the property went would appear from the fact, that Abraham Piatt, one of the plaintiffs, and Isaac Dunn, father of most of the others, were at the sale, and bid in property for J. W. Piatt, who is charged with holding it by virtue of a swindle precisely similar to' that which is alleged against Catharine and Nicholas Longworth. With such an experience of their own at hand, when Abraham and the descendants of Dunn came to the settlement of 1846 it is quite likely they would endeavor to learn if Mr. Longworth had been as peculiar in his conduct as they themselves had been.
At the date of this settlement no fiduciary relation any longer existed between Mr. Longworth and the heirs as to the property now in controversy. I believe that the intimation in Barrington v. Alexander, 6 Ohio St. 189, is the correct rule : that when property is sold, the deed executed, and the money paid, the fiduciary relation of the administrator as to that property ceases any longer to exist. The deeds of the administrator wex'e executed in 1834; some, pex’haps, earlier than that date. When, therefore, the heirs approached the administrators in 1846, the fiduciary relation had ceased as to such property as had been sold and coxxvoyed at least twelve yeai’s before. In law, therefore, they were dealing at arms’ length, and the intervention of able counsel and the precautions they took show that they wex’e so dealing jn fact. It seems to me they were fairly put upon an inquiry, which other circumstances within their knowledge must have suggested. I believe not only that they ought to have made that inquiry, but that they did make it; that they not only oxxght to have known what was in the deed of 1834, but that they did know it. It is proper to observe that if axxy one living did know that this px’opex’ty was bought for Longwoi’th in 1825, Mr. Anderson must have known it, and the same remark may be made of B. M. Piatt, co-administrator.. Both deny knowledge *217 or suspicion - even of such a fact. It is also proper to say that of the heirs who took part in the settlement no one has come forward to assert his ignorance of the deed of 1834, and its contents at the date the settlement was made. This ignorance is asserted in the bill, but 1 have not seen that it is sustained by any sworn oath of those who knew whether the fact was true or false. ■
If remote circumstances are to guide our inferences in this matter, it seems to me just as fair to charge these heirs with seeking an undue advantage as to attribute the same design to Mr. Longworth. The plaintiffs are at pains to show by the cross-examination of Mr. Anderson that at the settlement in 1846 the idea of this secret trust was not then alluded to by them. This is to show their entire ignorance of the matter at that date. What they had been unable to learn, or even suspect, in the long period of time that elapsed between 1825 and 1846, they were able to discover in all its particulars between 1846 and 1850. By the settlement made, they realized, as is said, a large property. In 1850 they file this bill against Longworth and various members of their own family. In the progress of years they eliminate their -own relations from the controversy, and Longworth is left to contend alone against the ingratitude of those to whom he had already saved a fortune. It seems to me just as fair to say that they made the settlement of 1846 with all the knowledge they now possess; that they made it with the deliberate intention of getting into their hands whatever they could by negotiation, and then springing this charge at such time as should suit their purpose, meaning to prosecute it in such a manner as should not be too severe upon their own friends.
Originally there were quite a number of defendants made to this bill. All of those who have answered deny all the charges of fraud and conspiracy, aud controvert the plaintiffs’ case in every particular. Plaintiffs appear to have been satisfied with this denial, for they are all dismissed. If we seek the testimony of witnesses, I am unable to find one, with perhaps the exception of Isaac Bunn, who testi *218 fies on the point, wbo does not testify in opposition to complainants’ theory. As to the documentary evidence, so much relied upon, it must be construed in a sense directly opposite to that which the words import to make a case at all. It is my belief, therefore, that the sales in question were really made as they purport to have been; that the actual purchasers were those named; that not until some years after did Mr. Longworth conceive the idea of buying, which he then had a perfect right to do. Hpon the whole ease — upon the evidence, which is voluminous, and the arguments of counsel, on both sides unusually able and thorough — I do not for one moment hesitate in my convictions. My only doubt arises from the fact that I am- so utteidy at variance with a majority of my colleagues.
Whitman, J., &1so dissented.